Opinion
HUFFMAN, J.
In this appeal of a judgment denying a petition for writ of administrative mandate, appellants Anserv Insurance Services Inc., and its two officers Earl C. Nelson and W. Brian Hames (collectively Anserv) challenge the decision of the superior court that upheld an administrative decision in favor of the real party in interest, the California Department of Insurance (the Department or DOI), revoking their professional insurance licenses. (Code Civ. Proc., § 1094.5.)
On appeal, Anserv raises several challenges to the judgment: (1) the Department exceeded its jurisdiction by seeking to regulate insurance transactions in Mexico that should have been governed by Mexican, not California, law; (2) the administrative process deprived Anserv of a fair trial and constituted an abuse of discretion; and (3) the Department abused its discretion by adopting an administrative decision that lacks support in substantial *201 evidence, including, in particular, the penalty imposed. We have considered these arguments under the appropriate standards and find them each to be lacking in merit.
Factual and Procedural Background
Anserv, a corporation, held insurance licenses as a fire and casualty broker agent and surplus lines broker. Hames was Anserv’s chief executive officer, chief financial officer, and a director, and was individually licensed as a fire and casualty broker agent and as a life agent. Nelson, Anserv’s president and a director, had been in the insurance business about 50 years, and held fire and casualty broker agent licenses, as well as being a licensed life agent and a transactor. They operated an office and engaged in the business of insurance in the County of San Diego.
These disciplinary proceedings by the Department arose out of Anserv’s alleged multiple Insurance Code violations with regard to two Anserv insurance programs, the Mexican Auto Program (MAP) and the Taxi Insurance Program (TIP). For both programs, Anserv was the managing general agent for an Arizona insurer, American Bonding Company (ABC). Originally, ABC (also admitted as an insurer in California) had a subsidiary (Insurance Company of the Americas (ICA)) that also offered insurance through MAP, but ABC took over its subsidiary’s activities and became the sole carrier for MAP. ABC had extensive business problems unrelated to these programs, and on October 26, 1994, ABC was placed under a cease and desist order by the Department. It was later placed into receivership in Arizona and into conservatorship in California.
Under MAP, Anserv managed the program, in which Mexican insurance agents known as “subproducers” sold auto liability coverage for residents of Mexico while they drove automobiles in the United States. Anserv received premiums from customers who had paid them to the Mexican subproducers. Anserv made quotes and adjusted claims from their San Diego office. ABC was the insurance carrier for MAP, responsible for all claims up to $50,000 per occurrence. The policies provided that a second excess insurer would be responsible for all claims in excess of $50,000. Anserv had a California trust account at a San Diego bank, and deposited premiums into this account and paid amounts due to ABC and its subsidiary ICA on the MAP program.
The TIP program was administered by Anserv for a nonprofit association of taxi medallion holders who bought commercial auto liability insurance. The TIP members made single payments that included both amounts due for premiums and contributions to a “loss pool fund,” which allowed the TIP *202 insureds to pay deductibles out of the fund. ABC was the carrier on this TIP program.
When ABC’s business was restricted beginning in October 1994 by the Arizona and California Departments of Insurance (i.e., that no new ABC business could be written in California), Anserv principals sought guidance from those departments and from ABC regarding their ability to continue to do business in the TIP program. Anserv continued to write policies on TIP during the periods of restriction imposed by the cease and desist orders from the California and Arizona Departments of Insurance. It differed from the DOI position that “servicing” existing policies meant no new business could be written, such as adding new vehicles to policies.
After the cease and desist orders were issued, Anserv issued endorsements that modified MAP policies to remove ABC as the primary carrier and substitute another carrier. For example, Anserv created an offshore insurance company (Anserv Ltd.) to service the MAP program as a replacement insurer, even though it was not admitted as a California insurer. The consent of the insureds was not obtained as required, even though this amounted to a novation of the policy contract. Anserv also made changes to the MAP policies regarding the excess insurance arrangement. It wrote policies exposing ABC to more liability than the $50,000 it originally agreed to provide.
In December 1996, the Department prepared an accusation that alleged a number of Insurance Code violations regarding MAP and TIP. This accusation was amended twice, once immediately before the administrative hearing. The second amended accusation includes allegations that Anserv designed and marketed the MAP and TIP programs for ABC through subproducers. With respect to TIP, the allegations were that although Anserv had knowledge of the California and Arizona cease and desist orders by October 1994 (that ABC could not write any new or renewal insurance policies in California), Anserv continued to transact TIP business using ABC policies through April 1995. Anserv was also alleged to have commingled in an improper fashion the TIP premium amounts and the loss pool fund contributions (intended to pay deductibles per incident).
The accusation included allegations about MAP as follows: Anserv attached endorsements to ABC’s MAP policies to replace ABC with other insurers that were not legitimate insurers. Anserv also was alleged to have written policies that exposed ABC to more than the $50,000 liability it had agreed to provide, by failing to obtain legitimate excess insurance that would cover any additional risk. Anserv retained portions of the premiums that were due to ABC from MAP.
*203 The matter went to an administrative hearing before an administrative law judge (ALJ). Extensive testimony and exhibits were submitted. During the hearing, the ALJ criticized portions of the Department’s case against Anserv as based upon hearsay and on untimely provided documents. The witness lists provided were inaccurate in some respects.
The hearing was held in September 1997, but the ALJ did not issue his decision for 120 days thereafter. That decision revoked the insurance licenses of Anserv and its principals, rejecting their jurisdictional arguments and their arguments that fair procedure had not been afforded. The ALJ found that Anserv had conducted its licensed activities in San Diego County. With respect to MAP, Anserv quoted premiums to prospective purchasers and received premiums from subproducers in San Diego, and conducted claims adjustment and made payments there. Anserv used a San Diego bank for its MAP payments and receipts of premiums. The ALJ found Anserv had written excess coverage purporting to bind ABC and its subsidiary to greater amounts than they had agreed to undertake. It had improperly replaced ABC as a carrier and had not remitted all premiums due to ABC. Although the Department attempted to bring in evidence about related filings that were allegedly falsely made by Anserv with the Public Utilities Commission and the Interstate Commerce Commission (the PUC and the ICC), that evidence was excluded.
In connection with the TIP program, the ALJ noted Anserv could administer certain claims and could engage adjusters and attorneys with ABC’s approval. Anserv improperly continued to write TIP policies during the period that the cease and desist orders were in effect, until April 1995. The ALJ found improper commingling of TIP trust funds. The standard used by the administrative law judge was the clear and convincing standard of proof. The penalty recommended was revocation of the licenses.
After the decision of the ALJ was rendered, the Department adopted it and revoked the Anserv licenses. Anserv sought a writ of administrative mandamus to challenge this action of the Department. (Code Civ. Proc., § 1094.5.) Because licensing matters were involved, the trial court used its independent judgment in evaluating the administrative record and the allegations of the petition. The trial court ruled that substantial evidence did not support the ALJ’s finding on commingling of TIP funds. However, the court found that the allegations of the petition had been sustained in the remaining respects. The trial court did not disturb the penalty of license revocation that had been imposed, and issued judgment denying the petition. Anserv appealed.
*204 Discussion
I

Standard of Review

This petition for superior court review of a final administrative determination by writ of mandate was brought under Code of Civil Procedure section 1094.5. Because it involved fundamental vested rights of the Anserv officers to pursue their livelihoods, the trial court reviewed this administrative decision under the independent judgment standard of review, as set forth in subdivision (c) of section 1094.5. That subdivision provides in relevant part: “Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence.”
This standard was further explained by the Supreme Court in Fukuda v. City of Angels (1999) 20 Cal.4th 805 [85 Cal.Rptr.2d 696, 977 P.2d 693]: “In exercising its independent judgment, a trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence.” (Id. at p. 817.)
Generally, on appeal, even where the trial court was required to review the challenged administrative decision under the independent judgment standard, the standard of review of the trial court’s determination remains the substantial evidence test. (Fukuda v. City of Angels, supra, 20 Cal.4th at p. 824.) However, on appellate review, to the extent pure questions of law (e.g., jurisdiction) were decided at the trial court upon undisputed facts, a de novo standard will apply at the appellate level. (Rosenblit v. Superior Court (1991) 231 Cal.App.3d 1434, 1442-1443 [282 Cal.Rptr. 819] (Rosenblit); Imperial Irrigation Dist. v. State Wat. Resources Control Bd. (1990) 225 Cal.App.3d 548, 553 [275 Cal.Rptr. 250].)
Also, an exception to the substantial evidence standard of review applies where review of an administrative penalty is conducted: Although neither a trial court nor an appellate court is free to substitute its discretion for that of an administrative agency concerning the degree of punishment imposed, a penalty determination may be set aside if the licensee has demonstrated an agency abuse of discretion in that respect. (California Real Estate *205 Loans, Inc. v. Wallace (1993) 18 Cal.App.4th 1575, 1580 [23 Cal.Rptr.2d 462]; see Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 1999) ¶ 8:128.3, p. 8-59.)
Further, there is authority that a challenge to the procedural fairness of the administrative hearing is reviewed de novo on appeal, since the ultimate question of procedural fairness amounts to a question of law. (Rosenblit, supra, 231 Cal.App.3d at pp. 1443-1444; Clark v. City of Hermosa Beach (1996) 48 Cal.App.4th 1152, 1169-1170 [56 Cal.Rptr.2d 223].) It may as easily be said that the substantial evidence standard is more suitable in this context, based on the fact intensive nature of the trial court’s findings on the procedure used and the fairness of it. (See Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs, supra, at ¶ 8:127.1, p. 8-57.) In an abundance of caution, we should use the more protective de novo standard, where licensing rights are involved.
Thus, Anserv had the burden of convincing the trial court the administrative findings were contrary to the weight of the evidence. The trial court’s decision reveals that it properly presumed the administrative findings were correct, throughout its careful examination of the evidence on the claims of agency abuse of discretion that were based on an alleged lack of substantial evidence support for the administrative decision. However, the trial court properly addressed the jurisdictional questions as matters of law arising from the established facts, and gave great deference to the agency’s discretion in the penalty area.
Having stated the applicable rules of review, we turn to Anserv’s substantive arguments.
II

California Department of Insurance Jurisdiction to Discipline

We review the record de novo to decide as a question of law whether the Department had an adequate basis to exercise its jurisdiction on the MAP program allegations. (Essentially, Anserv does not challenge the jurisdiction exercised as to the TIP program.) The accusation included numerous alleged violations of Insurance Code sections 1668, 1668.5 and 1738. These sections deal with the specific grounds for denial of or revocation of licenses, and the procedure for doing so.
*206 The trial court rejected the jurisdictional challenge, ruling that the federal tax cases presented by Anserv were not on point,[1] because the state was not attempting to impose a tax on a foreign entity, but was seeking to regulate conduct of state licensed insurance agents, regardless of the location of the activities and conduct.
Similarly, the trial court and the ALT relied on the California authority of Foster v. McConnell (1958) 162 Cal.App.2d 701 [329 P.2d 32] which held there was state jurisdiction to enforce the Insurance Code provisions intended to protect the public, even where the insurance agent had done the questionable acts upon federal property (a military installation). The court in Foster explained its reasoning: “We are not concerned here with the question of the state making regulations concerning the selling of insurance on government reservations. We are concerned with the protection of the public from one holding a state insurance agent’s license and who, regardless of whether his acts occur within or without the state, demonstrates that he does not maintain professional standards in his conduct of the insurance business.” (Id. at p. 708.)
The ALJ also relied on Skiriotes v. Florida (1940) 313 U.S. 69, 77 [61 S.Ct. 924, 929, 85 L.Ed. 1193] where the United States Supreme Court held that the state could regulate the behavior of its citizens while they were on the high seas, even to the extent of criminal sanctions.
In the case before us, Anserv’s offices were in California, and numerous monetary transactions took place there. Anserv incorrectly relies on Insurance Code section 35, subdivisions (a)-(c) as defining transactions of insurance as including only solicitation, negotiations preliminary to execution, or execution of the contract of insurance. Under Insurance Code section 35, subdivision (d), transaction of insurance also includes “matters subsequent to execution of the contract and arising out of it.” The collection of premiums and execution of endorsements and excess insurance provisions clearly amount to such “matters subsequent to execution of the contract” (ibid.), and there was therefore California activity by the Anserv officials in their capacities as insurance agents, sufficient to enable California jurisdiction to be exercised. Moreover, even though Mexican customers bought the MAP policies from Mexican subproducer insurance agents, who then forwarded premiums to. Anserv for delivery to ABC, the risks to the insured were those arising from driving in the United States. This also constitutes a sufficient *207 nexus between the insurance transactions Anserv facilitated and the protection of the California public.
Finally, to the extent Anserv is claiming that under Insurance Code section 1668.5, subdivision (a)(5), a Mexican or other conviction is required before any California discipline may be imposed, it is in error. That subdivision provides one such ground for discipline, but not the only one. Here, the jurisdictional issue is clear, that the Department may take action against its licensees who do not maintain professional standards in their conduct of the insurance business, “regardless of whether [the] acts occur within or without the state.” (Foster v. McConnell, supra, 162 Cal.App.2d at p. 708.)
Thus, we independently reach the same conclusion on the jurisdictional issues as did the ALJ and the trial court, based chiefly on the Foster v. McConnell, supra, 162 Cal.App.2d 701 case: Regardless of whether the insurance agents’ acts occurred within or without the state, the Department had jurisdiction to regulate their conduct that occurred in their capacity as California licensees. (Id. at p. 708.)
III

Procedural Fairness

Anserv contends on several grounds that it did not receive a fair trial in the administrative process, amounting to the Department’s abuse of discretion in this respect. First, Anserv points out that the ALJ’s decision was rendered more than 30 days after submission of the matter, i.e., 120 days late. To support its claims of prejudice from the delay, Anserv argues that the ALJ must presumably riot have had the evidence fresh in his mind 120 days after submission of the matter. Under Government Code section 11517, subdivision (c)(1), an ALJ who hears a contested case “shall prepare within 30 days after the case is submitted” the proposed decision. As noted in Outdoor Resorts etc. Owners’ Assn. v. Alcohol Beverage Control Appeals Bd. (1990) 224 Cal.App.3d 696, 702-703 [273 Cal.Rptr. 748] (Outdoor Resorts), statutory provisions establishing time limits for acts to be done are generally considered to be directory in the administrative context, not mandatory and jurisdictional, “ “unless a contrary intent is clearly expressed . . . (Id. at p. 702, citing Woods v. Department of Motor Vehicles (1989) 211 Cal.App.3d 1263, 1267 [259 Cal.Rptr. 885].) Thus, “a time limitation is usually treated as merely directory ‘ “ ‘unless a consequence or penalty is provided for failure to do the act within the time commanded.’ ” ’ ” (Outdoor Resorts, supra, at p. 702.) In this case, Government Code section *208 11517, subdivision (c)(1) does not specify any penalty for an ALJ’s failure to act within the specified time. The opposite is true, since the same statute continues, “Failure of the administrative law judge to deliver a proposed decision within the time required does not prejudice the rights of the agency in the case.” Thus, on its face, this argument is weak as it affects the Department’s rights. (See also Chrysler Corp. v. New Motor Vehicle Bd. (1993) 12 Cal.App.4th 621, 629-633 [15 Cal.Rptr.2d 771].)
Anserv, however, relies on an Education Code case, Garcia v. Los Angeles County Bd. of Education (1981) 123 Cal.App.3d 807, 813 [177 Cal.Rptr. 29], for the proposition that administrative time limits should be considered mandatory, not merely directory, when a fundamental vested right is involved. Although that may be true in the school attendance context, based on a legislative history analysis (id. at p. 811), the more pertinent authority is that dealing with administrative time limits in licensing cases such as Outdoor Resorts, supra, 224 Cal.App.3d 696, finding them to be directory, not mandatory, in nature. Also, it is merely speculative to assume that the delay in issuing the decision reflected any decay in the ALJ’s grasp of the evidence presented before him. We cannot presume prejudice under these facts or find any denial of due process due to the delay that occurred.
Moreover, under Government Code section 11517, subdivision (c)(2), once the ALJ issued a proposed decision, the agency has up to 100 days after the decision is rendered to take action or to be deemed to have taken action. Here, once the proposed decision was issued on March 18, 1998, the Department adopted it 12 days later on March 30, 1998. Although the statutory scheme provides that 130 days shall be the normal upper time frame for a final decision, this decision took 33 days longer, which does not seem to be a prima facie case of denial of due process.
The next objection Anserv raises is that the second amended accusation was not served until less than two working days before the hearing, thus impairing its ability to prepare its defense. This argument is not well taken, because Anserv’s counsel waived any such objection at the hearing by acknowledging such service and proceeding to present a defense. Government Code section 11507 provides that service of the accusation or amendments thereto may be made up to the time of submission of the matter, if appropriate opportunity to defend against any new charges was afforded. Anserv does not now claim the second amended accusation included any such new charges requiring any significant change in its defense at the hearing.
Similarly, Anserv does not go into any specifics about the inaccuracy of the Department’s witness list, to show how it was prejudiced in that manner. *209 Although Anserv complains that certain documents were not timely produced, it was able to present its defense with the discovery provided, and has not shown unfairness in that ruling.
To the extent Anserv argues that references to alleged false filings it made with the PUC and the ICC prejudiced it, its argument is not well taken because the ALJ excluded such evidence. Similarly, although the ALJ criticized the Department’s presentation as partially based on hearsay, Anserv has not explained any particular erroneous evidentiary rulings or shown a denial of due process with respect to hearsay. The decision and the penalty imposed could well have been based upon the other evidence presented, as we will next explore.
On the basis that the ultimate question of procedural fairness amounts to a question of law (Rosenblit, supra, 231 Cal.App.3d at pp. 1443-1444), we conclude that on this record, none of the procedural deficiencies shown amounted to reversible error.
IV

Substantial Evidence Review

Applying the substantial evidence test (Fukuda v. City of Angels, supra, 20 Cal.4th 805, 824), our inquiry is whether the Department abused its discretion in imposing this discipline. Specifically, when the Department adopted the ALJ decision, Anserv contends that it used an incorrect standard of proof regarding whether Anserv continued to owe MAP premiums to ABC. This argument appears to be based on the concept that where there is conflicting evidence, no clear and convincing showing could have been made sufficient to withstand appeal. Anserv’s argument is that it overpaid ABC certain TIP premiums, and should have been afforded a credit for the amount Anserv still owed to ABC on MAP. Anserv also argues that because its carrier, ABC, never opened a trust account to receive MAP premiums, as agreed, ABC thus breached its own contractual duties and obviated any Anserv duty to perform under the MAP program.
Neither of these arguments is well taken, because in view of the conflicting evidence, the trial court had an ample basis to conclude there was no clear entitlement to the kind of TIP/MAP offset that Anserv now claims, since these were separate programs. Also, it was not error for the trial court to conclude that Anserv had contractual duties to ABC that were breached here, in such a manner as to cause harm to ABC due to Anserv’s failure to *210 remit all premiums due and in such a manner as to breach its duties to meet professional standards as an insurance licensee.
Anserv again presents its own view of the evidence to claim there were no bad faith violations of the Department’s cease and desist orders with respect to the TIP policies (that no new ABC business could be written in California). However, there is evidence in the record to justify a finding that Anserv sold new TIP business after it received notice of the cease and desist orders, that it did not correctly interpret the advice it received regarding permissible “servicing” of the policies, and that the Department had the authority to regulate such conduct.
Anserv also argues the ATI’s decision is mainly based on innuendo and an assumed “specter of other violations,” as referred to in the decision itself. Anserv defends its decision to create its own foreign replacement insurance carrier, on the basis that Mexican insureds would not care whether the actual insurance carrier on the policies they bought was foreign or admitted in California. Similarly, Anserv denies it forged any documents regarding MAP excess policies, or intentionally misled ABC regarding commissions for the excess insurance, and points out that no such express rulings were made at the conclusions of the decisions. However, even though the ALJ found, at most, negligence in the handling of the MAP excess policies by Anserv, that would still be consistent with a decision to impose discipline. The ALJ made underlying findings of breaches of duty by Anserv and also intentional misleading of ABC. We conclude that although there may be some unsupported references to unproven other violations in the ALJ decision, the record contains solid evidence of sufficient violations of the Insurance Code to justify the disciplinary orders made.[2] (Ins. Code, §§ 1668.5, 1738.)
Finally, we are only authorized to set aside a penalty determination if the licensee has shown the agency abused its discretion in that respect. (California Real Estate Loans, Inc. v. Wallace, supra, 18 Cal.App.4th at p. 1580.) Nothing in the findings or decision of the trial court or ALJ persuades us that any Department abuse of discretion occurred in this penalty decision. We are loathe to substitute our own discretion for that of the administrative agency, so long as it was, as here, exercised within its jurisdiction and expertise.
*211 Disposition
The judgment is affirmed. Costs are awarded to respondent.
Kremer, P. J., and Nares, J., concurred.

See, e.g., Conn. General Co. v. Johnson (1938) 303 U.S. 77, 80-81 [58 S.Ct. 436, 438, 82 L.Ed. 673]: “[T]he due process clause denies to the state power to tax and regulate the corporation’s property and activities elsewhere. . . . ¶ . . . [where no] act in the course of their formation, performance or discharge, took place [in the state].”

Similarly, although the ALJ found there had been impermissible commingling of TIP trust funds, the superior court found there was a lack of substantial evidence to support that particular finding. Even if we agree with that analysis of the evidence, it still does not warrant overturning of the trial court’s decision or the penalty imposed. (Ins. Code, §§ 1733, 1734, subd. (b).) For purposes of this review, we may omit consideration of the commingling of funds issue, as it is not a dispositive issue.